## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## MARTINSBURG

**CHERYL ANN GRAGG,**

**Plaintiff,**

**v.**                                                    **CIVIL ACTION NO.: 3:17-CV-110**
                                                          **(JUDGE GROH)**

**NANCY A. BERRYHILL,**
**Deputy Commissioner of Operations,**

**Defendant.**

### REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On September 6, 2016, Plaintiff Cheryl Ann Gragg ("Plaintiff"), by counsel Jan Dils, Esq., filed the Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Deputy Commissioner of Operations[1] ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On November 13, 2017, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed the Answer and the Administrative Record of the proceedings. (Answer, ECF No. 4; Admin. R., ECF No. 5). On January 12, 2018, and February 12, 2018, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."),

---

[1] According to the Government Accountability Office, as of November 17, 2017, Nancy Berryhill had no authority to act in her position of Acting Commissioner of Social Security because her appointment violated the Federal Vacancies Reform Act. As such, Ms. Berryhill will continue in her capacity as Deputy Commissioner of Operations.

ECF No. 11).  Following review of the motions by the parties and the Administrative Record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   PROCEDURAL HISTORY

On February 7, 2014, Plaintiff filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging that her disability began on June 15, 2002. (R. 18).  Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2006; therefore, Plaintiff must establish disability on or before this date. (R. 18).  Plaintiff's claim was initially denied on May 1, 2014, (R. 18), and denied again upon reconsideration on July 9, 2014 (R. 18).  On August 21, 2014, Plaintiff filed a written request for a hearing, (R. 18) that was held before United States Administrative Law Judge Jon K. Johnson ("ALJ"), on July 27, 2016, in Charleston, West Virginia. (R. 18).  Plaintiff, represented by Counsel Harold Carpenter, Esq.[2], appeared and testified, as did Nancy Shapiro, an impartial vocational expert. Id. On September 1, 2016, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 15-25). On July 9, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 7-9).

## III.   BACKGROUND

### A.   Personal History

Plaintiff was born on January 18, 1967, and was forty-nine years old at the time she filed her first SSI claim. (Pl's Mem. in Supp. Mot. Summ. J. (ECF No. 10), p. 2). She completed high

---

[2] Plaintiff was represented by Harold Carpenter at the ALJ hearing on July 27, 2016. (R. 34), but Jan Dils, Esq., took over Plaintiff's representation sometime after the hearing.

school and her prior work experience included working as an accounting clerk. Id. She was married at the time she filed her initial claim and at the time of the administrative hearing. (R. 39). She has two children, who are independent. Id. In her Complaint, Plaintiff alleges disability based on her experiencing major and minor seizures following her 1996 car accident, accompanied with migraine headaches, hyperventilation, and vertigo. (Pl's Mem., p. 3)

**B.    Medical History**

**1.    Medical History Pre-Dating Alleged Onset Date of June 15, 2002**

Plaintiff's medical records demonstrate that Ms. Gragg began experiencing what she identified to her doctor as "spells," beginning as early as October 9, 2000, when Plaintiff was admitted to the hospital complaining of dizziness. (R. 304). Subsequently, on November 10, 2000, Plaintiff visited St. Joseph's Hospital and underwent an electroencephalogram ("EEG") that resulted in a normal study. (R. 266). On November 29, 2000, Plaintiff met with Dr. Scott Sole, who noted that Plaintiff described her spells as episodes where "she becomes light headed and complains of tingling and numbness in her hands and face." (R. 264). During these episodes, Plaintiff described that she felt nauseated and she experienced a "skin crawling sensation" that would resolve after a few minutes. She was then prescribed Paxil. On January 4, 2001, Plaintiff saw Dr. Sole for a follow-up neurological consultation. Plaintiff noted that she had observed a decrease in the episodes; however, there have been no significant changes in her overall condition. Dr. Sole planned to follow-up with Plaintiff three months later. (R. 267). From January 2, 2001 until January 15, 2001, Plaintiff's doctor excused her from work as her absence was medically necessary. (R. 660).

### 2.  Medical History Post-Dating Alleged Onset Date of June 15, 2002

On February 2, 2006, Plaintiff met with Dr. Dawlah for a neurologic consultation. During this consultation, Dr. Dawlah reported that for the past decade, Plaintiff had suffered from "spells" that left Plaintiff stiffened, foaming at the mouth, and unresponsive for approximately thirty seconds. (R. 273). The doctor reported that Plaintiff had a head injury that occurred approximately ten years prior to the 2006 neurological consultation and Plaintiff has since suffered from "spells/probable seizures, migraines, and Cranial MRI abnormalities." (R. 274). On February 15, 2006, Plaintiff visited Stonewall Jackson Memorial Hospital for an MRI of the brain that showed "[s]cattered very small punctate high signal intensity lesions as noted, question relationship to an occult embolic events or chronic vascular mediated headaches. Other pathology cannot fully be excluded, and at some point repeat study with contrast is suggested for further evaluation." (R. 277). On February 23, 2006, Plaintiff visited Dr. Dawlah, who stated that Plaintiff presented with:

> Episodes during which she goes 'blank'. It may last for thirty seconds. She may black out. She does not fall to the ground. She reportedly has had two episodes wherein she stiffened and had some foaming at the mouth. . . . Sometimes after the episode she may feel slightly nauseated. She has had migraine like headaches for four or five years. She has two or three of these a month. She becomes nauseated. . . . She has some photophobia. She has had impaired short-term memory for the last year. She may misplace things and at times, forget people's names.

(R. 273).

Under the doctor's "impressions," the doctor noted that Plaintiff suffers from "spells/probable seizures, migraines, [and] cranial MRI abnormalities." (R. 274). The doctor took Plaintiff off Depakote and started her on Topamax to be steadily increased over the following weeks. On February 27, 2006, Plaintiff underwent an EEG at United Hospital Center

that resulted in a normal awake EEG. (R. 271). On March 1, 2006, Plaintiff underwent another EEG at United Hospital Center for an EEG that resulted in a normal awake/sleep EEG. (R. 270).

On March 22, 2006, Plaintiff was seen for a neurologic follow up appointment and informed her doctor that she was doing well on the Topamax because she had not had a seizure preceding two and a half weeks. (R. 272). On January 19, 2007, Plaintiff was seen by Dr. Navada for a neurologic follow-up for her continuous "spells." He determined that he did not believe the seizures to be spells and that some of her symptoms were probably stressed related. (R. 321). Dr. Navada tapered her off Topamax and prescribed Lexapro. Id. She was again reminded that she should not operate a motor vehicle until she is spell free. Id. On August 20, 2007, Plaintiff underwent several examinations that indicated that it was a normal initial portable chest radiographic study and normal pre-contrast CT scan of the brain. (R. 285, 86).

On August 21, 2007, Plaintiff was admitted to Stonewall Jackson Memorial Hospital complaining of "chest pain described as sharp, lasting a few minutes, without radiation . . . [and] some finger numbness." (R. 279). Plaintiff received a Head CT scan, resulting in "normal precontrast . . . scan findings of the brain [and r]ight greater than left ethmoid mucosal thickening changes compatible with sinusitis." (R. 286). Plaintiff was discharged and prescribed Dilantin. (R. 281). On August 23, 2007, Plaintiff underwent an EEG that demonstrated "epileptiform activity over the right temporal lobe. The findings represent a risk factor for clinical seizures." (R. 293). On August 31, 2007, Plaintiff saw Dr. Navada for a neurological follow-up and determined that her present symptoms suggest seizures. He noted that she has had an EEG that was abnormal, but she has had previous normal EEG's within acceptable limits. (R. 329). Plaintiff described to Dr. Navada that her "spells" make her feel like she is in "another world," and does not remember the episodes. Id. She described that she "loses her balance," and

"she has had some episodes occur at night wherein her hands become 'drawn.' She may 'chew up' her tongue. She has even lost control of her bladder." Id. Dr. Navada continued Plaintiff on Dilantin.

On September 14, 2007, Plaintiff visited Dr. Navada for another neurological follow up. She noted that she broke out in a rash that Dr. Navada noted was probably caused by the Dilantin. Id. On October 22, 2007, Plaintiff visited Dr. Navada who noted that he did not want to place her back on anticonvulsants until her rash had completely resolved. (R. 335). He also noted that the "[i]nput of WVU will be obtained at a later date." Id. On October 31, 2007, Plaintiff went for a neurological follow up and was placed back on Depakote, after she developed a rash caused by Dilantin and Tegretol. (R. 335).  On December 4, 2007, Plaintiff's doctor, Jack Riggs, who detailed Plaintiff's past history of Dilantin, Tegretol, Depakote, and Topamax that were all ineffective or caused an allergic reaction. (R. 343). Dr. Riggs noted that he "could find no focal or lateralizing neurologic abnormalities." Id. Dr. Riggs started Plaintiff on phenobarbital. Id. Plaintiff underwent an EEG on December 4, 2007, that "demonstrate[d] epileptiform abnormalities that [Dr. Brick] believe[d] appear[ed] independently over the 2 sides of the scalp." (R. 344).

Plaintiff was then admitted to the United Hospital Center on December 30, 2013, after being seizure free for four years. (R. 385). Plaintiff was transported via EMS after gasping for air in her sleep and showing signs that she was unable to breathe. (R. 408). Plaintiff's body stiffened, she clenched her teeth, and she stared off, unable to speak. (R. 408). Plaintiff's husband was unable to wake her up. Plaintiff remained in this state until EMS arrived approximately twenty-five minutes after the onset of this seizure. Id. Plaintiff was unable to remember that event during the doctor's assessment after Plaintiff regained consciousness. (R.

385). On December 31, 2013, Plaintiff received a CT scan of the brain that showed "no acute intracranial process [and m]ild paranasal sinus mucosal thickening." (R. 394). Plaintiff underwent an MRI of the brain without contrast that showed there was "small vessel disease a little more than expected for age but still fairly mild." (R. 395). On January 23, 2014, Plaintiff had an EEG that resulted in "a normal awake and sleep EEG. . . . that does not exclude the diagnosis of epilepsy." (R. 430).

On March 10, 2014, Plaintiff had an EEG that resulted in a normal awake and sleep EEG, which did "not exclude the diagnosis of epilepsy." (R. 428). On November 14, 2014, Plaintiff underwent a "normal awake and sleep EEG. . . . [which did] not exclude the diagnosis of epilepsy." (R. 536). On November 16, 2014, Plaintiff was admitted to the hospital and "present[ed] with multiple tonic, clonic seizures. . . . [S]he was 'zoning out' . . . hard to communicate with, [and] was 'not focusing.'" (R. 545). The medical records depicted that on her way to the hospital, she had a generalized tonic/clonic seizure. The medical records also represented that Plaintiff had a known seizure disorder that was first diagnosed in 2000 and was (at the time of this hospital visit) prescribed Phenobarbital and Keppra. (R 545). The medical records also stated that Plaintiff "has petit mals regularly, nearly weekly, sometime multiple times a week. Her last tonic, clonic seizure was in Jan 2014." (R. 545).

On November 16, 2014, Plaintiff underwent a Head CT without Contrast that resulted in "no acute intracranial process." (R. 461).  Plaintiff also underwent an Extended EEG (a normal awake and asleep 24-hour video EEG monitoring) which resulted in recurrent seizures. (R. 548). On November 17, 2014, Plaintiff underwent another EEG (a normal awake and asleep 15-1/2 hours video EEG monitoring) with no spells recorded. (R. 549). On January 2, 2015, Plaintiff underwent an EEG, which resulted in a normal study during periods of wakefulness and sleep.

(R. 551). On November 11, 2015, Plaintiff underwent a Brain MRI with and without Contrast, resulting in "[g]reater than expected amount of non-masslike regions of increased signal on T2-weighted images within the subcortical white matter. These are nonspecific in nature. These do not demonstrate restricted diffusion or abnormal postcontrast enhancement. No findings suggestive of an etiology for the patient's seizures." (R. 578).

### 3. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

On February 7, 2014, agency reviewer, Kathy Westfall, reviewed Plaintiff's records and determined that "there is insufficient evidence for the DLI period to determine the severity of the physical allegations." (R. 57). The disability determination report stated that "[a] medically determinable impairment (MDI) has not been established and therefore consideration of Symptoms and Credibility is not applicable to this claim." (R. 58).

On April 29, 2014, agency reviewer Holly Cloonan, Ph.D., reviewed Plaintiff's records and determined that there were "no mental medically determinable impairments established." (R. 57). Further, "there [were] no records of a mental condition or mental health treatment for the time period of DLI." (R. 57).

#### b. *Disability Determination at the Reconsideration Level*

On July 2, 2014, agency reviewer Atiya M. Lateef, M.D., reviewed the prior Disability Determination and determined that the Plaintiff does not have a medically determinable impairment. (R. 64). The determination states that "[t]he evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim." (R. 63).

On July 1, 2014, agency reviewer Rosemary L. Smith, Psy.D., reviewed the prior PRT assessment and affirmed it as written. (R. 64). The record stated that "there are no records of a

mental condition or mental health treatment for the time period of DLI 12/31/2006 [and that there is] insufficient evidence to assess." (R. 64).

## C.    Testimonial Evidence

At the ALJ hearing held on July 27, 2016, Plaintiff testified that she is married and lives with her husband and her two adult children, Chelsea (26) and Hollie (22). (R. 39). Plaintiff testified that she worked at Glenville State from 1987 or 1988 until 2001, when she resigned from her position. (R. 39-41). She testified that she experienced trouble at work because her boss was unsatisfied with her work performance. (R. 40).

Plaintiff further testified that she suffers from both grand mal seizures and "mini mal" or smaller seizures, as well as migraine headaches. (R. 42). She testified that she does not remember when the major big seizures began, but she did not suffer from them prior to her car accident in 1996.[3] (R. 43). Plaintiff testified that she had no recollection of what occurs during a seizure, but her family describes the events to her after the seizure. (R. 43). She then described her mini mal seizures, stating that she does not understand what happens during the seizures, but realizes what happens after a seizure is over and those particular seizures do not last as long as the grand mal seizures. (R. 44). Plaintiff described her migraine headaches as causing "much sensitivity to the light and sound" making her nauseated and sick, and this occurs approximately three to four times a month. (R. 46). At the hearing, Plaintiff testified that prior to her car

---

[3] Plaintiff was involved in a motor vehicle accident on February 12, 1996. She was taken to an emergency facility in Calhoun County and presented with confusion, agitation, and dysarthria. She was then transferred to St. Joseph's Hospital. A CT scan was obtained, presenting in a normal result. Cervical Spine X-Rays and Chest X-Rays were also normal. She was discharged on February 16, 1996, with the following diagnosis "cerebral concussion, basilar skull fracture, facial abrasions, scalp laceration, lumbar compression fracture, [and] anemia secondary to blood loss." (R. 642). She was instructed to return for a follow up two weeks after discharge and to avoid physical exertion, heavy lifting, and bending. She was instructed that if she developed "increasingly severe headaches, persistent nausea and vomiting, difficulty walking, or any convulsions, that she should return immediately to the Emergency Department." (R. 642).

accident she did not suffer from major big seizures, mini mal seizures, nor migraines. (R. 46). Plaintiff testified that her doctors also advised her not drive. (R. 48).

**D.     Vocational Evidence**

Nancy Shapiro, vocational officer, also testified at the hearing.   Ms. Shapiro characterized Plaintiff's past work as an accounting clerk, which has been classified as sedentary work. (R. 51). Ms. Shapiro testified that there is a greater tolerance for absences in her type of work than for unskilled work because employers award sick days and time off. (R. 51).

**E.     Disability Reports**

The disability report stated that Plaintiff suffered from seizures due to head trauma, confusion, memory loss, and chronic fatigue that limit her ability to work. (R. 153). Plaintiff reported that she stopped working on June 15, 2001 "because of [her] condition(s)." (R. 153). Plaintiff stated that she has only had "one job in the last 15 years before [she] became unable to work." (R. 154). The report also indicated that Plaintiff used machines, tools or equipment; used technical knowledge or skills; and wrote, completed reports, and performed duties like this. (R. 155). She reported that during her employment, Plaintiff walked, stood, and sat for approximately four hours a day; stooped, kneeled, and crouched for approximately two hours a day; handled large objects for approximately two hours; wrote, typed, or handled small objects for approximately eight hours a day; and reached for approximately eight hours a day. (R. 155). She reported that Plaintiff was prescribed Acetaminophen, Benadryl, and Phenobarbital. (R. 156).

The report also indicated that Plaintiff was treated at University Hospital Center in March 2014, for PCP. (R. 156); treated by Dr. Levos from 1999 to 2006 for her seizures (R. 157); treated from 2001 to 2006 for heart palpitations and wooziness by Dr. Pamfilis (R. 159); treated

at Ruby Memorial from 2009 to 2014 for seizures (R. 160); treated in February 1996 for head trauma. (R. 158); and treated from 2001 to 2006 by Dr. Sole for head trauma. (R. 160).

The disability report on appeal stated that Plaintiff has difficulty with "personal tasks tak[ing] longer to complete." (R. 180). Plaintiff also reported that her driving is restricted, she has difficulty concentrating, she is easily confused, and her memory problems have worsened. (R. 180).

### F.    Lifestyle Evidence

On her adult function report dated March 27, 2014, Plaintiff described that she was restricted in her driving, suffered from short and long term memory loss and confusion, has "no attention span," was exhausted and weak, suffered from seizures, and was a fall risk. (R. 164). She stated that since the onset of her illness/condition, she has difficulty with her memory and staying on task, in addition to not being able to work. (R. 165). Plaintiff also testified that she became a restless sleeper and continues to have difficulty getting to sleep at night. (R. 165). Her husband must remind her to take her prescribed medication, as Plaintiff is not capable of remembering. (R. 166). She stated that she is able to prepare weekly meals with the assistance from her daughters, but the task takes longer than normal to complete. (R. 166). She stated that she is able to go outside, but does "need someone to check on her if she is going somewhere." (R. 167). She described that she is incapable of driving, as she states that her seizures prevent her from driving. (R. 167). She also stated that although she is able to pay bills, her husband "looks over [her] figures to make sure [she does] not make errors." (R. 167).

On her second adult function report dated July 8, 2014, Plaintiff reported that her driving is still restricted, has difficulty concentrating, she still becomes easily confused, and Plaintiff's memory problems have worsened. (R. 180). She also reported that personal tasks take longer for

her to complete. (R. 180). Plaintiff described that she is able to take care of her animals, with the help of her family, and can do some cooking and cleaning. (R. 184). She noted that prior to the onset of her seizures, she "used to do it all by [herself], and pretty much keep it up." (R. 187). Plaintiff also stated that now everything must be marked on a calendar and she must be verbally reminded by her family every day. (R. 188). Plaintiff also stated that there "are sometimes explained to me multiple times." (R. 188). She described that she was still able to attend church and be involved in church activities. (R. 188).

The record also contained four letters from Plaintiff's family and friends, including a letter from Plaintiff's daughter, Hollie Gragg, her mother, Janet Sheets, her pastor, Dwight Goff, and her friend, Letisha Kinder, that detailed several examples of how Plaintiff's seizures have affected her life since their onset. (R. 198). Hollie Gragg stated that Plaintiff's "epilepsy" affects her life as she is unable to sustain employment, is forgetful, and is unable to be left alone and Hollie wrote that she must stay in constant contact with Plaintiff. (R. 201). Plaintiff's Pastor, Dwight Goff, also wrote a letter detailing the impact of the seizures on Plaintiff's life, including her hospitalization when she has big seizures and has become completely dependent on others for her transportation. (R. 202). Plaintiff's mother, Janet Sheets, detailed the impact of Plaintiff's seizures on her life, including Plaintiff's inability to function for up to several three to four days following a seizure due to exhaustion and weakness accompanied by migraines. (R. 203). Letisha Kinder, Plaintiff's friend, detailing one example of when the Plaintiff went to the hospital for her seizures, and ended the letter stating that "most days are good, but some days are not so good." (R. 204).

Plaintiff completed an Adult Seizure Form which stated that she last saw Dr. Riggs on May 7, 2014 and Dr. Navada on December 20, 2013. (R. 172). She stated that she does "not

remember anything that happens during a seizure . . . [and knows] only what [her] family has told [him]." (R. 173). Plaintiff noted that the grand mal seizures occur only when she is sleeping and her mini mal seizures occur randomly throughout the day. (R. 174). Plaintiff's daughter also corroborated that Plaintiff's seizures occur during both the day and night and at random times. (R. 175). Hollie Gragg also stated that she has witnessed Plaintiff staring blankly and confused, and suffers from memory loss, muscle spasms, convulsions, and has chewed on her tongue. (R. 175). She also stated that her seizures can last anywhere from thirty seconds up to forty-five minutes. Id. Immediately following a seizure, Hollie Gragg reported that Plaintiff is confused; has blurred vision, headaches, lightheadedness, slurred speech, memory loss; and is tired. Id.

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 15, 2002 through her date last insured of December 31, 2006 (20 CFR 404.1571 et seq.).

3.  Through the date last insured, the claimant had the following medically determinable impairments: history of migraine headaches, seizure-like episodes, hyperventilation, vertigo, and status post motor vehicle accident with cerebral concussion, skull fracture, lumbar compression fracture, and anemia (20 CFR 404.1521 et seq.).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairment (20 CFR 404.1521 et seq.).

14

> 5. The claimant was not under disability, as defined in the Social Security
> Act, at any time from June 15, 2002, the alleged onset date, through
> December 31, 2006, the date last insured (20CFR 404.1520(c)).

(R. 20).

# VI.    DISCUSSION

## A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment … if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (quoting Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964). As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, 295-95 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at 869. Moreover, while an ALJ is not required to discuss every piece of evidence, Reid v. Commissioner, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at his peril.

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.   Contention of the Parties

Plaintiff, in her Motion for Summary Judgment, asserted that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot.

at 1).  Specifically, Plaintiff alleges that the ALJ erred by denying Plaintiff benefits at step two of the sequential process. (Pl.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 10, p. 1). The ALJ's decision was based purely on medical records that were issued prior to Plaintiff's DLI. She also argued that the decision did not include consideration of the medical records from 2006 until 2015 that demonstrated the effect of Plaintiff's impairments on her basic work activities prior to the DLI. Id. at 9. Plaintiff argued that the ALJ improperly failed to consider this medical evidence as it relates back to Plaintiff's condition prior to the DLI and that the post-DLI medical records illustrate the existence of the onset and degeneration of Plaintiff's impairment prior to the 2006 diagnosis. Id. Plaintiff requested that the Court to "remand of this matter for correction of these errors is warranted." Id. at 10.

Defendant, in its Motion for Summary Judgment, asserted that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Defendant focused its argument on, and supported the ALJ's depiction of Plaintiff's resignation, the finding that because Plaintiff resigned for reasons unrelated to her condition Plaintiff did not suffer from a condition that severely limited her ability to perform basic work activities. (R. 7). Defendant also alleges that the ALJ's decision was justified because "[t]here was ample evidence in the record from the period at issue, June 15, 2002 through December 31, 2006, for the ALJ to determine that the post-DLI evidence did not relate-back to Plaintiff's condition during the pre-DLI period." (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") ECF No. 12 at 1). Defendant focused on the normal results of the CT scans and MRIs as justification that Defendant did not suffer from seizures, and concluded that the ALJ's decision was based on substantial evidence because "the post-DLI evidence failed to offer a retrospective opinion on the past extent of Plaintiff's impairment." Id. at 7.

**C.     Analysis of the Administrative Law Judge's Decision**

**1.  The ALJ decision determining that Plaintiff did not suffer from a "severe" impairment prior to the date of last insured was not supported by substantial evidence.**

Social security regulations state that if there is no substantial gainful activity performed during the pertinent time period, the ALJ must consider whether there is an impairment "result[ing] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. Substantial gainful activity is defined as "work that [i]nvolves doing significant and productive physical or mental duties; and [i]s done (or intended} for pay or profit." 20 CFR § 404.1510 (2014). Moreover, this impairment must prohibit Plaintiff from participating in basic work activities for a continuous period of twelve months. Basic work activities include:

> Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.

20 FR § 404.1521.

To establish whether a physical impairment exists, the ALJ must consider the evidence consisting of signs, symptoms, and laboratory findings, and may not purely rely on Plaintiff's complaints of her symptoms. 20 CFR § 404.1508. "Symptoms" consist of the plaintiff's own description of her physical or mental impairment. Although these alone are not enough to establish a physical impairment, they are influential when combined with "signs" and "laboratory findings." "Signs" are "anatomical, physiological, or psychological abnormalities that can be observed, apart from [a plaintiff's] statements." These may be shown through "medically acceptable clinical diagnostic techniques." Laboratory findings include "anatomical,

18

physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques, . . . includ[ing] chemical tests, electrophysiological studies, roentgenological studies, and psychological tests." 20 CFR § 404.1528. In determining how the medical signs and laboratory findings are regarded, the adjudicator considers all the symptoms and the extent to which the symptoms "can reasonably be accepted as consistent with the objective medical evidence." 20 CFR § 404.1528.

When evaluating the intensity and persistence of the impairment, the adjudicator must consider "all of the available evidence, including [plaintiff's] history, the signs and laboratory findings, and statements from [plaintiff], [plaintiff's] treating or nontreating source, or other persons about how [plaintiff's] symptoms affect you." 20 CFR § 404.1529(c). Because symptoms can actually suggest a more severe condition, self-reports, specifically information regarding causes that precipitate or aggravate plaintiff's symptoms, medications, treatments or methods to alleviate effects, and how the symptoms affect daily activities are particularly important. Id.

Under step two, an impairment "is not severe [considered] if it ha[s] no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities." Id. The ALJ is required to consider the combined limitations of all Plaintiff's impairments on an individual's physical or mental activities. Social Security Ruling 85-28, 1985 WL 56856. If the medical evidence demonstrates that the person is able to perform basic work activities, the severity requirement cannot be met. Id. There is "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered," an impairment or combination of impairments can be found "not severe" and "not

disabled." Social Security Ruling 85-28, 1985 WL 56856. If Plaintiff cannot show through medical evidence that there is more than a minimal effect on the person's physical or mental abilities, the "adjudication must continue through the sequential evaluation process." Id. The plaintiff bears the burden of demonstrating that the medically determinable impairment is severe enough "that it prevents her from engaging in any substantial gainful activity that exists in the national economy." 42 U.S.C. § 423(d)(1).

> If the ALJ:
>
> is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, if the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

Social Security Ruling 85-28, 1985 WL 56856.

The ALJ accepted that there was a medically determinable impairment through the date last insured, December 31, 2006, citing a "history of migraine headaches, seizure-like episodes, hyperventilation, vertigo, and status post motor vehicle accident with cerebral concussion, skull fracture, lumber compression fracture, and anemia." (R. 20). The Plaintiff did not engage in substantial gainful activity prior to the DLI, as her last employment ended on June 15, 2001. (R. 248). Thus, the only issue concern is if there was substantial evidence demonstrating whether her medically determinable impairment was severe enough to significantly limit Plaintiff's ability to perform basic work activities for a period of twelve consecutive months.

a.  **ALJ cherry-picked the evidence that demonstrated that Plaintiff's condition was not severe, specifically only considering Plaintiff's EEG and doctor's appointments prior to the date of last insured.**

While the ALJ reiterated the facts of the case in his explanation, he did not properly consider the totality of the effect of her conditions from its onset until the date of last insured. Had the ALJ considered the totality of the evidence, the ALJ would likely have determined that Plaintiff had a severe condition that significantly limited her ability to perform basic work activities. Instead the ALJ cherry picked the facts that were unfavorable to Plaintiff and found that there is no evidence that Plaintiff suffered from these conditions to the extent that Plaintiff claims. The ALJ also ignored the effects of Plaintiff's condition and found that because Plaintiff's doctor's appointments did not last for twelve months consistently, her condition did not significantly impair her ability to participate in basic work activities.

i.  **The ALJ only considered her doctor's appointments to determine whether condition lasted for more than 12 months.**

The ALJ determined that while the record provided doctor's excuses for Plaintiff to miss work on certain days in early 2001, "her treatment did not require her to be absent of for a period of at least 12 months." (R. 24). Plaintiff at no time alleged that her doctor's appointments were keeping her from working. Plaintiff's entire argument is centered on her seizures and the accompanying ailments of her "spells," including confusion, memory loss, dizziness, and migraines and not how much work time she would miss as a result of her doctor's appointments. Although Plaintiff was not diagnosed until 2006, that does not negate Plaintiff's argument that she had been suffering from seizure-like activity and other physical ailments for years prior to the DLI.

During the hearing, the ALJ only asked the vocation officer whether or not Plaintiff's type of employment would allow her to be absent for excused periods of time to for doctor's appointments and treatment for her conditions.

> Q: What can you tell me about her job?
> A: The Claimant's past work as an accounting clerk, DOT number 216.482-010, classified as sedentary work, SVP-5.
> Q: Semi-skilled. Right?
> A: Yes.
> Q: So there's a greater—or is there a greater tolerance for absences than for unskilled work?
> A: For that job, yes, where it was. She—yes.
> Q: And why do you say that?
> A: Because usually they get time off, sick days, things like that.

(R. 51). Plaintiff also testified that in her position she would get one and a half sick days a month. (R. 51). The vocational officer was correct to consider how many sick days Plaintiff would receive in her position, but that was all she considered. The vocational officer testified that Plaintiff's treatment and doctor's appointments would not affect her ability to show up for work, but did not address how Plaintiff's memory loss, confusion, dizziness, and spells would affect her ability to perform tasks at her employment. The ALJ considered this, and while noted that Plaintiff received written doctor's excuses when medically necessary, her appointments did not cause to her miss a continuous twelve month period at any time from 2002 to 2006.

Also in the record is written documentation from the Plaintiff's former employer denying Plaintiff the ability to take sick leave and threatened her job if she were to leave work sick. This completely inconsistent with the ALJ's argument that Plaintiff's employment would not be affected by her seeking treatment for her condition. (R. 250-51). While the Plaintiff is given a certain amount of sick days each month, her type of employment does not seem to be as flexible as previously testified to by the vocational officer to allow Plaintiff to leave work, without being reprimanded, when necessary. In fact, the employer threatened to fire her if she left work early

even though he was fully informed of her condition. (R. 248-49, 250-51). The vocational officer did not inquire into whether one and a half sick days would be sufficient based on her complaints and details of her accompanying symptoms. The ALJ did not even consider this, even though Plaintiff specifically testified to this at the Hearing.

### ii. The ALJ determined that Plaintiff's condition was not "severe" based on one normal EEG.

As Defendant reiterated in its Memorandum, the ALJ's decision was based on the encephalogram examination, which indicated normal results, that was taken prior to the DLI. The ALJ, while correct to review and give merit to the medical records, disregarded the fact that seizure activity does not appear on electroencephalogram reports unless a seizure occurs during the study. (R. 22). The ALJ used these normal findings to justify that there was only "seizure-like" activity occurring, but not to the extent that it would be considered to have significantly impaired Plaintiff. (R. 24); see also Plf's Mem., p. 7 ("Because . . . her encephalogram results were normal, and her neurological examinations revealed no abnormalities, the ALJ reasonably found that Plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities."). Rendering a decision based on the absence of an abnormal study does not alone indicate that Plaintiff does not suffer from seizure-like activity that affects her ability to perform basic work activities. The ALJ should have considered the totality of the evidence.

### b.	The ALJ did not consider the totality of the evidence to determine whether Plaintiff's condition significantly limited her ability to perform basic work activities.

While the ALJ was correct in considering the medical evidence, the ALJ is supposed to consider the totality of the evidence, rather than cherry pick facts that support the conclusion that he has determined. When an ALJ considers the severity of an impairment, the ALJ must

"consider . . . an impairment both individually and in combination with a claimant's other impairments." <u>Stemple v. Astrue</u>, 475 F. Supp. 2d 527, 536 (D. Md. 2007). In this case, the ALJ determined that there were significant "episodes of seizure-like activity . . . he finds nothing to support [that] any such episodes that would happen with such frequency or involve debilitation prior to the claimant's date last insured of December 31, 2006." (R. 24).

The ALJ should have considered the severity of Plaintiff's condition—a combination of all of her complaints—to determine whether she was able to perform basic work activities for a twelve consecutive months from June 15, 2002 until December 31, 2006. Instead the ALJ only considered Plaintiff's doctor appointments and her treatment to determine that she did not suffer from a "severe" impairment. For the ALJ to have determined all of the evidence, he would need to have considered all of the evidence, which includes symptoms, signs, and laboratory findings, when combined evidenced plaintiff "severe" condition.

### i. Symptoms

The Plaintiff's personal statements and testimony should have been considered in determining the pervasiveness and consistency of Plaintiff's condition. While the ALJ noted the Plaintiff's personal statements, statements of others, and testimony in the record, the ALJ provided no explanation into how this information was considered nor seemingly addressed this evidence in his reasoning. Nor did the ALJ provide Plaintiff with an explanation of how much weight was given to this relevant evidence.

The pervasiveness and intensity of the seizures and associated conditions demonstrated that these seizures were occurring multiple times a month and migraines occurred just as often. Plaintiff kept a log recording the persistence of her seizures and migraines in a journal beginning in October 27, 2005 until November 18, 2007. (R. 218-23). The logs detailed that on October 27,

2005, Plaintiff suffered multiple spells throughout the night and into the day. (R. 254). On November 24, 2005, Plaintiff described that she had approximately ten different spells throughout the day. Id. On December 22, 2005, Plaintiff had approximately three to four different spells throughout the day and multiple spells throughout the night. Id. The following day, Plaintiff suffered from eight to ten spells. Id. Beginning in January of 2006, at least twice a month, Plaintiff suffered from days with multiple spells, including days with as many as ten spells, including "spells" on January 30; two to three spells on January 31; ten spells with an accompanying migraine on February 1; two spells at night on March 3; three spells on March 6; a "blackout" spell on April 4; and spells on April 8, May 7, June 11 and 12. Id. On July 11, 2006, Plaintiff noted a major spell that left her incapable of remembering what occurred. Id. Plaintiff suffered from spells on July 12 through 14 and August 28 and 29. Id. Her next string of spells occurred on October 20 and 21 and December 9 through 11. Id.

This lasted until 2007 when the occurrence of her spells increased. On January 19, 26, and 27, Plaintiff suffered from her spells. Id. On March 4, Plaintiff suffered from a spell that she does not recall or remember anything. During this spell, she lost control of her kidneys. She then suffered from spells on March 5, 8, 9 and April 17, 18, and 19. Id. On May 23, she suffered from a bad headache overnight and woke up to discover that she had chewed her tongue. Id. She also suffered from spells on May 29, 30, and 31. In July, Plaintiff suffered from spells on the eighth and ninth and on August 19, Plaintiff detailed "fingers/arms started drawing/numb w/ hurting in chest. Got sick. Hospital did stress test and put on Dilatin. Notes Neuro. Took off Dilantin and Rxd Tegretol." Id. On September 17 and 18, Plaintiff suffered from a bad headache. On September 19 and 20, Plaintiff suffered from spells all day. On October 19 and 20, Plaintiff suffered from an allergic reaction to Tegretol. Id. She also noted spells on October 21, 22, and

23. Id. On November 17, Plaintiff noted a bad seizure during her sleep of which she has no memory, she lost control of her kidneys, and woke up to her tongue and legs hurting. Id. She then noted that she had spells on November 18 and 19. Id.

Along with her spells, she reported that she feels nauseated after episodes. Id. This was also evidenced by the several personal letters from both Hollie Gragg and Janet Sheets, Plaintiff's daughter and mother, respectively. (R. 198-201, 203). Hollie Gragg detailed that the effects that these "spells" had on her Plaintiff, including the randomness and unpredictability of the occurrence of the seizures. (R. 198). Hollie Gragg also stated that following Plaintiff's migraines, the Plaintiff would be immobilized in her bed for days and would "lose time" from the seizures. (R. 199).

Janet Sheets detailed the activities that Plaintiff was unable to complete as a result of her condition. Ms. Sheets stated that Plaintiff is unable to drive and is unable to do basic chores at home without supervision, such as mowing the lawn. (R. 203). Ms. Sheets also described that Plaintiff had a hard time remembering information, including dates and whole conversations that occurred. (R. 203). Plaintiff's confusion and memory loss is documented as early as 2000 and 2001. Plaintiff's trouble with her employer is well documented and includes one instant in which Plaintiff walked into a copy machine after becoming dizzy at work.

Plaintiff also repeatedly told her doctors that she suffered from spells and migraines; and she would become nauseated following a seizure. She also reported to her doctors that she had impaired short term memory and that she misplaces things. She told her doctors that she forgets names and "feels like she is in another world." She also loses balance sometimes when she has these seizures. There is also recorded documentation from that Plaintiff was suffering from

health conditions beginning as early as 2000 and these health conditions were affecting her work performance.

### ii.  Signs

Signs are "anatomical, physiological, or psychological abnormalities which can be observed, apart from [plaintiff's] statements." 20 CFR § 404.1528. These must be shown through "medically acceptable clinical diagnostic techniques." Id. The medical records have long indicated that Plaintiff has been suffering from seizures and conditions related to her seizure-like activity, including debilitating headaches, staring spells, and grand mal seizures. The first recorded medical evidence of the onset of Plaintiffs condition began in 2000. On October 9, 2000, Plaintiff was admitted to the hospital, complaining, amongst other symptoms, of dizziness and was prescribed medicine to alleviate symptoms. (R. 304). Her doctors also believe her to have been suffering from seizures and migraines and prescribed her medication to eliminate the persistent seizures and alleviate the symptoms of her migraines. The first noted complaint of her "spells" was on November 29, 2000, in which Dr. Armstrong noted that Plaintiff:

> States over the last several years she has had episodes which she describes as spells where she become light headed and complains of a dizzy type sensation. . . . She complains of tingling and numbness in her hands and face. . . .  She says initially she is cold and then gets somewhat diaphoretic. She feels nauseated but has never vomited during these episodes. . . . She also complains of skin crawling sensation. . . . Approximately a week ago she did have one and got somewhat disoriented and fell, but there has been no significant loss of consciousness during these episodes. Three weeks ago she started having episodes of her mouth watering and followed by vomiting. The last three days she has had significant vomiting. . . . She has occasionally been woken with the parenthesis at night as well.

(R. 264-65). During her follow up consultation on January 4, 2001, Plaintiff again complained of her symptoms and that her "episodes" were continuing. (R. 267). Plaintiff was even excused from her work, by her doctor, from January 2, 2001 until January 15, 2001.

Plaintiff continued to suffer from seizures and accompanying conditions through February 2006 when she began seeing her doctors more frequently for the same complaints that occurred before. At this time that Plaintiff's condition escalated. On February 2, 2006, Plaintiff had a neurological consultation regarding her complaints of "spells" that leave her stiffened, foaming at the mouth, and unresponsive for approximately thirty seconds. Plaintiff then received an MRI on February 15, 2006. She visited the doctor again on February 23, 2006. She was then hospitalized on February 27, 2006. She went for an EEG on March 1, 2006 and a neurological follow up on March 22, 2006. She was even prescribed an anti-convulsion medication in 2006 to alleviate her seizures. This condition did not merely appear out of nowhere to such severity as demonstrated above. Plaintiff had been suffering from this condition and her associated ailments since 2000.

While the condition may have amplified in 2006, there is no evidence to show that Plaintiff's symptoms prior to 2006 were not present for at least twelve months prior to December 31, 2006, which would consider the impairment "severe." The claimant was repeatedly seeking doctor's help prior to this initial diagnosis and was suffering from the same symptoms and ailments as after the diagnosis, the only difference being the doctors had failed to diagnose Plaintiff's seizures for at least four years. Plaintiff should not be punished as a result of her inability to get adequate medical treatment or a doctor's inability to diagnose Plaintiff. See, e.g., Lovejoy v. Heckler, 790 F.2d 1114 (4th Cir. 1986) (finding that it was improper for the adjudicator to consider the plaintiff's failure to obtain medical treatment as a consideration of the severity of her condition."). More evidence that she was suffering from a condition that was persistent was her doctor's warning for her not to operate a motor vehicle until she is spell free. (R. 321).

### iii.  Laboratory Findings

The ALJ justified its decision based on the lack of medical evidence, citing the 2000 normal EEG that demonstrated that "there was insufficient evidence regarding significant impairments prior to the claimant's date last insured." (R. 24). The ALJ disregarded that while Plaintiff underwent multiple normal tests after her diagnosis, she also had tests that were abnormal. Her first normal test was in 2000 which resulted in a normal study. Plaintiff also had a normal study on February 27, March 1, 2006 and August 1, 2007. She underwent an MRI of the brain on February 15, 2006 that resulted in "[s]cattered very small punctate high signal intensity lesions as noted, question relationship to an occult embolic events or chronic vascular mediated headaches. Other pathology cannot fully be excluded, and at some point repeat study with contrast is suggested for further evaluation."   She underwent an EEG later that year that demonstrated "epileptiform activity over the right temporal lobe . . . represent[ing that Plaintiff is] a risk factor for clinical seizures. (R. 293). Then in December 2007, Plaintiff underwent an EEG that "demonsrate[d] epileptiform abnormalities that [the doctor] believe[d] appear[ed] independently over the 2 sides of the scalp." (R. 344).

### iv.  The totality of the evidence shows that Plaintiff suffered from a condition that lasted continuously for 12 month, which significantly impacted her basic work activities.

The ALJ determined that Plaintiff suffered from a medical determinable impairment and that Plaintiff could reasonably suffer from the alleged symptoms, but "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 22).  In this case, Plaintiff only needs to demonstrate that she is unable to perform basic work activities, including "capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding

appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting" during Step Two of the evaluation.

The evidence demonstrates that Plaintiff suffered from these seizures multiple times a month with an accompanying headache beginning in 2000. This would include Plaintiff staring off, stiffening, and was unable to remember what occurred during the mini seizure. Plaintiff detailed her symptoms in a personal journal that demonstrated that she was experiencing seizures that were escalating as time passed. Plaintiff's family and close friends detailed the effects of Plaintiff's seizures on her life that indicated that she has memory problems and confusion. This memory loss was also represented to the ALJ as part of the reason that Plaintiff initially resigned from her position at Glenville State College. Plaintiff complained of her symptoms of memory loss, confusion, and increased seizures, which are accompanied by debilitating migraines that render Plaintiff bedridden for day. She told her family and friends, her employer (prior to her resignation) and to her doctors.

Plaintiff visited her many doctors who were unable to prescribe medication that relieved any of the symptoms of her condition or stopped her seizures until 2007 or even properly diagnose Plaintiff until 2006. Plaintiff described her symptoms that demonstrated her condition was worsening from 2000 until 2006. The medical records detail Plaintiff's requests for help from her doctors and have complained of her symptoms since 2000. Her medical tests demonstrate abnormalities after the DLI, she also underwent normal studies both before and after the DLI. The ALJ's conclusion that one EEG that demonstrated a normal study was sufficient to consider her condition not "severe" was erroneous and the medical evidence indicated that her tests were indicating that she had seizure activity and she continued having normal results even after the well documented advancement of her condition in 2006 just as she had prior to the DLI.

Plaintiff's seizure conditions limited her ability to do basic tasks throughout the day without being supervised, including paying bills or mowing the lawn, let alone basic work-related activities.

### c. ALJ wrongly considered Plaintiff's resignation in his decision that Plaintiff chose to be unemployed.

The ALJ focused his explanation for Plaintiff's resignation from her job in 2001 as evidence that because the ALJ believed that Plaintiff voluntarily left her job for reasons unrelated to her medical condition, Plaintiff had the ability to work but voluntarily chose unemployment. The ALJ determined that her resignation was due to poor job performance and insubordination. The statute states that if Plaintiff did not participate in substantial activity, Plaintiff must demonstrate that she was unable to perform basic work activities for a continuous period of twelve months as a result of her condition. The statute does not require that Plaintiff prove she left her prior employment because of this condition. Plaintiff only needed to demonstrate that at any time from June 15, 2002 until December 31, 2006, she was unable to perform basic work activities for a continuous period of at least twelve months.

Although it is not required, Plaintiff has demonstrated that her reasons for resigning from her position at Glenville State College were side effects of her seizures. While there were some issues with Plaintiff's job performance, Plaintiff contributed her performance to issues to her health. This was well documented in her letter of resignation addressed to Mr. Hardman dated April 24, 2001. (R. 248). This letter detailed her objections to her employer's memorandum authored on February 21, 2001. (R. 250). Plaintiff's letter details that she was sick on February 20th, 2001 and had to leave work early which was the reason that she left her cash drawer unbalanced and unclosed as complained about by her employer. (R. 248). She also indicated in her letter than Mr. Hardman denied her request to leave work on that same day and threatened

her job if she were to go home sick. (R. 249). Plaintiff also contacted an attorney and used an attorney to communicate with her employer as a result of the issues that arose because of Plaintiff's requirement to take time off for health reasons. (R. 237, 42, 43, 45, 47). While the ALJ assessed that her employment issues demonstrated to reflect her unwillingness to work, her resignation actually demonstrated the effects of Plaintiff's condition on her work performance and is not significant in the evaluation.

**2. Plaintiff's medical records post-date of last insured were not properly considered by the ALJ to determine whether the condition existed prior to the date of last insured.**

Medical records that evidence the claimant's insured status after the date of last insured are not automatically barred from consideration and may be used to help prove that a disability arose prior to the date of last insured. Bird v. Comm'r of Soc. Sec. Admin, 699 F.3d 337 (4th Cir. 2012). This retrospective consideration can be "reflective of a possible earlier and progressive degeneration." Id. at 341. "[T]he appropriateness of retrospective consideration of medical evidence, may be enhanced further by lay observations of a claimant's condition during the relevant time period." Id. at 341. Retrospective consideration is most appropriate when "'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." Id.

Although it was not until 2006 that Plaintiff was diagnosed, Plaintiff had suffered significantly for years. The record indicates that Plaintiff had been experiencing health issues following her car accident, including loss of memory, confusion, migraines, and "spells" that would occur multiple times a day and multiple days a month. The record also indicates that during late 2005 and into 2006, Plaintiff's symptoms actually worsened as Plaintiff "experienced significant episodes of dizziness/blackout/staring/lightheadedness up to 6-8 times a day" and the Plaintiff reported to her doctor's "constant symptoms of headaches," significantly impairing

Plaintiff prior to the DLI. (R. 22). At this point, she was formally diagnosed with "spells, non-specific cephalgia, and non-specific weakness or numbness." (R. 22). Plaintiff also reported more symptoms, including loss of balance and chewing of the tongue. (R. 22).

As detailed in Dr. Dawlah's notes during Plaintiff's February 23, 2006 doctor's appointment, he noted that Plaintiff described her "spells" including the accompanying migraines and photophobia that have lasted approximately four to five years and occur at least two or three times a month. (R. 273). The doctor recorded that Plaintiff had been placed on Topamax, which will hopefully relieve or stop Plaintiff's onset of migraines in addition to being used to treat Topamax. (R. 275). The record also indicated that the Plaintiff stated she has an impaired short-term memory for the preceding year, and may "misplace things and at times, forget people's names." (R. 273). Then in December 4, 2007, Dr. Riggs stated:

> After [Plaintiff's 1995 motor vehicle accident], she began having staring spells that slowing increased for a period of time and now occur about 10 times per month. These spells last 20-30 seconds. She also has spells at night where she may bite her tongue and have urinary incontinence.

(R. 343). She was then prescribed phenobarbital. Id.

These medical records should have been considered by the ALJ, not as evidence that Plaintiff had a medically recognized impairment—that has already been determined by the ALJ—but as evidence that the accompanying ailments have disrupted Plaintiff's life to the point she must be monitored at all times and her health has significantly deteriorated from the initial onset of Plaintiff's condition. The diagnosis and worsening of Plaintiff's symptoms as documented in her medical records in February 2006 and did not automatically begin upon the doctor's formal diagnosis. The debilitation of her condition has occurred over many years and the advancement of her condition was recorded by the doctors as early February 2006.

The ALJ should have considered the evidence after the DLI that her condition has progressed aggressively in 2005, 2006, and 2007, and Plaintiff had been suffering from symptoms that limited her ability to do anything. There is no evidence in the record that states that Plaintiff's memory loss, confusion, intense migraines that would require Plaintiff to be in bed for days, and the seizures occurred only after the doctor had formally diagnosed her. Rather, there is an abundance of evidence, specifically the medical test results, beginning in 2006, that demonstrate that she does have a condition which in combination of all of the other non-medical evidence demonstrates that Plaintiff was impaired for years. While the ALJ acknowledged Plaintiff's condition prior to the DLI, the ALJ did not fully explain why these medical records were insignificant nor how much weight these medical records post-DLI had in his final consideration. The ALJ should have considered that as evidence of how her condition affected her abilities from to the DLI. Had the ALJ considered those medical records, his conclusion regarding Plaintiff's condition and its effects on her ability to function would likely have been different than originally decided.

## **RECOMMENDATION**

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that

Plaintiff's Motion for Summary Judgment (ECF No. 9) be **GRANTED IN FULL**, Defendant's Motion for Summary Judgment (ECF No. 11) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** for the reasons set forth herein for further proceedings for a further analysis of Step Two.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this June 4, 2018

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE